Chief Judge Schroeder, Your Honors, may I request that I be allowed to reserve five minutes for my rebuttal argument? You may, but you have to help keep track of your own time, and that time is the total time. Very good. I think the clock needs to be reset, Your Honor. No, we just let it go. Oh, you do? I see. So when it gets to five, then you should sit down. Thank you. Okay. Your Honors, Mr. Bhagat's conviction was arrested improperly by a constructive amendment of the indictment in this case. The government admitted in the trial court, and here admits, that its sole theory throughout the proceedings in the district court was that Mr. Bhagat read an email in which inside information was contained about an Xbox contract that his employer was going to enter into. That theory was pursued in front of the grand jury. It is the basis on which an indictment was returned. It was the basis on which the entire trial was tried up until the very last moment when at closing argument the prosecutor introduced an entirely new theory, namely that Mr. Bhagat did not hear about this inside information solely from reading the email, but also from office gossip, because the prosecutor stated without any evidence that the company was abuzz with the news. That affected a constructive amendment of the indictment under this court's jurisprudence and under the Supreme Court's decision in Sterone, and warrants reversal of Mr. Bhagat's conviction in this case. This case, despite the prosecutor's argument here in this court, was a very close one. And I can tell you, even though I was not the trial lawyer in this case, there was no evidence directly implicating Mr. Bhagat in the receipt of inside information, and it was quite a shock when he was convicted. I will submit to the court that he was convicted because of an inappropriate and unfair leg up that the prosecution got by arguing this theory. I think the important question here, I mean, what kind of showing do you have to make that, assuming it was an error to permit that kind of argument to be made, what kind of showing do you have to make to show prejudice? Well, obviously if there was a constructive amendment, I don't need to show prejudice because that is an automatic reversal. That requires automatic reversal. Are you arguing it's a structural error? It's a structural error. Under this court's decision in Adamson, it requires reversal. And even if it's not, if the court does not agree that it's a constructive amendment but that it is a variance of the proof that was offered at trial, I submit that it was a prejudicial variance because, again, the jury heard something which was not presented to the grand jury and which therefore allowed Mr. Begat to be convicted. Let me ask you this. What evidence was presented in terms before the jury regarding the office-above theory? Nothing. So your argument is based solely on the prosecutor's statement and closing argument that the office was above. Yes. What's your best case authority for the proposition that closing argument can constitute constructive amendment of the indictment? There is no case that I've been able to find that says specifically closing argument. However, Von Stoll, this Court's opinion in Von Stoll, says that constructive amendment may be affected by a prosecutor. And that is what I've been able to find. Does that necessarily include presentation of evidence as opposed to argument? No, I think not. I would analogize it to this. It is akin, in my view, to a district court instructing a jury on elements that have not been presented in evidence, not in proof. The law is very clear that a district court can constructively amend an indictment by simply instructing a jury as to an additional element that has not been proved. Dipentino, this Court's case in Dipentino is evidence of that. But our jurisprudence on closing argument is a lot different than our jurisprudence on instructions. We give a lot of leeway in terms of closing argument. So I'm not sure that's a persuasive analogy. I would submit, Your Honor, that this Court gives leeway when leeway is due. Namely, if there is inferences to be argued from facts or evidence that are in the record, then, of course, leeway is accorded, and rightly so. This case was not that case. This is a case where you had an entirely new theory of possession, the key disputed element. Counsel, I wasn't at trial either, but my understanding from reading what I have read is that the principal issue, one of the principal issues, factual issues contested at trial was whether or not the defendant knew about the, whatever it was, the merger or... The contract. The contract. Before he made this profit on the stock. Yes. And he said that he didn't, and there was some government was arguing by circumstantial evidence that he did. Yes. And I thought that the closing argument was in the context of his credibility, because it meant that his credibility was the key issue at trial. So one would believe if one looked at the, just the prosecution's brief. But the record says otherwise. At excerpt of record 137, here's how the relevant portion of the prosecutor's closing argument goes. Quote, his, meaning Mr. Bogats, again, 137, Your Honors. Quote, his explanation about e-mail is not credible, and we're going to talk about credibility in a little while. Next sentence. In terms of whether he possessed the information, not credibility, but in terms of whether he possessed the information, you also should consider the magnitude of this news. This was big, big, big news. The company is abuzz with this news. These were people with their stock options... Whether or not he knew. I'm sorry? Your Honor? Whether or not he knew about the contract. Yes. But your Honor raised the point, is this a credibility argument? No. The prosecutor is saying it's not credibility. It's whether he knew. But, Counsel, is this the sole reference to the office-abuzz theory? No. It does go on. After an objection timely made by the defense, the prosecutor goes on to say this news was exciting enough and important enough that it generated not just one, but several e-mails. Yeah. But that's, is that an office-abuzz theory? I think in the context of what came before, yes. I think reasonably read, what the prosecution is trying to say is it's not just that Mr. Begutt cracked open his computer and read the e-mail, for which we can't give you a single shred of direct evidence, and nobody saw him do it, and he didn't confess to it, and there's no evidence of it at all, but that this was big, big, big news, and the company was abuzz with it, and it generated all of these e-mails, and so he must have known by simply walking through the front door. So I think reasonably read, yes. In fact, there's more on the next page, right, starting at line four. He walked through the reception area. He sat in a room filled with people. That's right. With cubicles with no doors. He went to the cafeteria, and he says, you know, he walked around in a bubble, and this big news didn't reach him over the course of the three hours, which is, you know what I mean, emphasizing the validity of the abuzz theory, right, that he had to have heard it just by walking around the office. Yes. And again, there was no evidence of it. He was not told beforehand that this would be introduced as a theory. He was never given the opportunity of introducing evidence to rebut this abuzz theory, namely, what were the cubicles like? Were they big or were they small? Were the cubicles next to him occupied or not? Was his cubicle the first as you walk in the door or the last? What was his demeanor at work? Was he social? Was he chatty? We do know in the record facts that demonstrate the opposite of his being susceptible to abuzz. He was a new employee. There was no evidence that he had even made friends at work at this point. He was there for slightly under two months. He was at that point obsessed, I would say is a fair characterization, with buying a house. He spent hours upon hours upon hours every day researching house prices. It is indeed reasonable to assume that Mr. Begat, not knowing anything about the office environment he walked into that day, sat around in precisely that bubble and was more concerned with his house arrangements than with anything else. Counsel, if we declined to make new law regarding constructive amendment and we were to analyze this under a variance, why is it not harmless? Well, you told me that there is no case that would transform closing argument into amendment of an indictment. So we'd have to make new law in order to make that ruling. I would consider it as a reasonable interpretation of Dipentino. So I suppose my semantic debate would be that that's not new law, Your Honor. But answering your question, it's not harmless for precisely the reasons that I think it's a constructive amendment. This was not presented to the grand jury. It was not noticed to Mr. Begat, even though Mr. Begat tried his hardest through his counsel to try to get the government to say, yes, is it only that I've read the e-mail? Is that the only theory? It would show that it's error, but why is the error not harmless in light of all of the evidence that was presented at trial? I think this is a very close case at trial. But wasn't this the largest trailblazer case? In here, in 1999, we have traded in a $59,000 amendment. This case, it was confessed that the $59,000 amendment was $61,000. And the very next, probably the very next week, we ask you to trade for a $99,000 amendment. And the next year, three cases, $20,000 apiece. And on and on. He held stocks for a very short period. As he was doing, he was doing all kinds of stocks. He advocated and circulated in stock prices. So you can't take this, the fact that it was, by a hair, the largest trade ever, as anything like compelling evidence of guilt. In fact, I would think it's completely consistent with his trading pattern. The same thing goes with whether or not other people who made trades that were associated with him, namely his friend, Manmeet Gill, or his other friend, Puneet Mehrotra, or his brother, whether the timing of those trades was suspicious. What about the testimony from the realtor? Robert Aldana. He was not charged with tipping Robert Aldana. I understand that. But there was circumstantial evidence that he was aware. That's true. But that information to Mr. Aldana occurred on March 9, which was two days after a public article appeared all over the Web to say that NVIDIA had been awarded the Xbox contract. There was a reason the government didn't allege that, because it was all over the place. And I would submit to you that Mr. Aldana's saying that Mr. Begut, indeed, passed this information on, is neither here nor there. Everybody knew about it by March 7. So, again, the people who were involved in these trades are unusual. They are all software engineers who are highly skilled and very avid stock speculators. March 6 was the single highest volume day trading in the NASDAQ of that entire year. Everybody and his mother was trading that day. The NASDAQ itself peaked to an all-time high that week. So, again, this case is an unusual case. It is a very close case in the facts. And to answer your question, finally, why is this prejudicial? It's because it's such a close case in the facts. Your Honors, I don't know where I am in my 15 minutes, but I do want to raise the issue. You've got two minutes before you have only five left. I do want to raise the sentencing issues. We have alleged error in the district court's analysis of loss or its calculation of loss. Again, I think this is a case where there isn't much law on either side. The guidelines require the court to take the difference or the profit as a result of the defendant's trading insecurities. It's just not clear what that means. And I would suggest, as I have by citing to these SEC cases, that the appropriate measure of loss is to try and cabin somehow loss to the actual malfeasance that the defendant is alleged to have engaged in, rather than simply taking in the universe that could be taken in by a simple subtraction method, sales price or buy price versus sales price. Counsel, if the law is not clear on it, then under what standard can we reverse the district court? I think because the district court had discretion here to come up with a calculation, I don't think the district court understood it had that discretion, and on that basis I think the court could say you did have discretion, you could have used a different measure, but you did not. If the court has discretion, we'd have to find that the court abused this discretion. Or I think that Judge White didn't understand he had discretion. I believe that Judge White believed he had to take the simple subtraction method of loss here when case law from the civil context would suggest that another method was available. So the court can say that Judge White erred in feeling his discretion to be nonexistent. What language in Judge White's calculation are you relying upon to say that he wasn't sure he had an option? Well, simply because he didn't give any shrift at all to our argument. Because he rejected your argument, you think he didn't understand it? It's not that he didn't understand it, but I think he didn't believe that he had any discretion to do anything other than do the simple subtraction method. He certainly didn't say I can't do it, but I think that was the gist. You have five minutes left. Thank you, Your Honor. I will rest for other arguments. Good afternoon. I'm Amber Rosen appearing on behalf of the United States this afternoon. And because we are both the appellee and the cross-appellant, I would also like to reserve a few minutes for rebuttal, if that's appropriate. Well, we don't really – I don't usually do that. Oh, okay. Very well, then. I think that's shot. Okay. First, I'd like to address the constructive amendment argument. And while generally constructive amendments are reviewed de novo, as we indicate in our brief, in this case, the standard of review should be plain error, because there was not a timely objection on this basis. At the time that the comments were made in closing argument, the only objection by the defense was that there was no evidence in the record about it. No objection was made on the basis of constructive amendment or variance, and that did not occur until the motion for new trial. And under SHPSE, that is not timely, and it should be reviewed for plain error. As to the merits, I think it's important to look at the entire closing when reviewing this, which puts the prosecutor's comments that are at issue in context. Did you try this case? I did not. The government repeatedly emphasized that the jury had to find that the defendant read the e-mail to be found guilty. Here are the comments that were made during closing regarding that. Quote, The March 5th e-mail from Jen Sun Huang to the employees is, in this case, the material nonpublic information. Next one. If it was hidden in his e-mail somewhere and he hadn't opened his e-mail and he hadn't looked at his e-mail, he wouldn't knowingly possess it. Next. But when you look at all of the circumstances in this case, all of the circumstances, you know that Mr. McGott saw that e-mail before he traded on March the 6th. Next. Ladies and gentlemen, the fact that he read Mr. Huang's e-mail is the only reasonable explanation as to the timing of his trade. Next. On Monday morning, he comes in, clicks open his e-mail, and he sees that they got the Xbox contract. So he dumped the Altera stock and he buys the NVIDIA stock. Next. When he said that he didn't read Jen Sun Huang's e-mail, he lied. He's guilty. Those comments were scattered throughout the closing. And I think it's also important to understand that the entire opening-closing argument was over an hour. There's a comment about that near the end of it. And that the comments that are in dispute in this case must have taken, at most, 30 seconds to say. I also want to say, although it may hurt my argument to some extent, that there was some evidence in the record about the office atmospherics or the fact that Mr. McGott had been in the office for several hours, that he worked in a cubicle, that he had been by the receptionist, that this was big news, that he'd been in the cafeteria. And one reason I pointed out is just to correct the record and to tell the Court that that appears during the cross-examination of the defendant. That was in Volume 9 and it's pages 53 through 57. But also to make the point that this was not part of the government's case in chief. All the whole theory presented in the case in chief was proving that, circumstantially, that the defendant read the e-mail, that he received it, that he used e-mail, that it was sent to him, all of those things. And there was not any evidence regarding the buzz theory or anything like that presented by the government in the case. And it was all elicited on cross as a means to challenge defendant's credibility that he knew nothing about this contract, that he didn't read the e-mail. Because I think a fair inference from the argument being made in the closing is that this was big news. He had to have heard about it. And that would have led him to, I mean, if nothing else, that would have led him to read the e-mail. And so what's your response to opposing counsels pointing out that the prosecutor said, we'll get to credibility in a moment. Right. And then talked about the office of buzz before talking about credibility. Well, I think you have to keep in mind just the realities of the way people speak and how they give closing arguments. I mean, it's not to say that the prosecutor wasn't saying, you know, that he doesn't say what he means. But I also think people have a tendency to sort of digress. They have an idea. They start speaking about it even though they maybe intended to speak about it later. And the fact that he says that right before he says it doesn't mean that it's not going to credibility. And that's why I say I think you need to read the entire closing and put it in the context of the entire closing where time again, after time again, he's emphasizing that the defendant read the e-mail and that they have to find that he read the e-mail to find knowing possession. Also, I want to – but I do want to go back to this point that I think the Court is right that simply even if this were a theory, which we do not believe, that just mentioning it once in closing isn't enough to constitute a constructive amendment and to show that this case is very distinguishable from all the cases cited by the defense on variance in constructive amendment. For example, in Shipsy, the indictments charged one specific theory. The evidence was presented on the different theory. The Court instructed on the different theory. And the prosecutor argued the different theory. In Dipentito, again, not only did the Court instruct on the different theory, but the prosecutor had said in closing, had argued the other – that the other theory and a witness had presented evidence on the other theory. In Styrone, the same thing. There was evidence on the different theory and instruction on the different theory, and I think with Adamson also. So there really is no case for precedent that one comment in closing argument where no evidence was presented by the prosecution in its case-in-chief and the instructions didn't specifically say it. There's been no case like that where reversal was given on this basis. So it's your – it's your position that there's no evidence to support the office of Buzz's comment? No. I think there was some evidence that came out in the cross of the defendant that – that during that cross, it was a – I thought you just said there was no evidence. No, no, no. I'm saying there was no evidence presented by the prosecution in its case-in-chief alleging this theory. There was some cross-examination. I know, but the prosecutor can only argue a closing argument in the government's case-in-chief. Is that what you're telling me now? I'm sorry. Say that again. Are you saying that the government should argue in its closing argument only what the government presents in its case-in-chief? No. I'm simply saying – What's the difference whether it's in case-in-chief or, you know, on cross-examination? I think when you go to constructive amendment and you're looking at the other cases where they found reversal, it's significant that in those other cases – What about variance? And for variance, too. I just think it's a significant difference that in those cases, it was presented as the government's theory as well as argued it and as well as given an instruction and that that's different from this case. And it's some evidence that it wasn't – that it wasn't – it's also circumstantial evidence that in the closing, it wasn't presented as an alternate theory. It was a further attack on credibility as that is also how it came out during the trial, as an attack on the defendant's credibility. Help me out on this all-abuzz. What – does the record indicate that the all-abuzz – that the office was all-abuzz with what? Is it your – it was my understanding it was all-abuzz with the fact that they got this big contract. Right. I didn't see any indication that it was all-abuzz about the precise timing of when it was going to be made public, necessarily. No, or none of the other details that were in the e-mail that the prosecution also argued in closing was the material non-public information. It was all of the information in the e-mail that included not just the fact of the contract, but how big the contract was, the timing of the contract, what it meant for the company. And his sale of the stock had to have been timed – his transactions had to have been timed with the timing of the announcement, didn't they? Correct. Correct. And I think it's also significant when you're looking at could this really have confused the jury given the context of the trial and the way the information came out, given the emphasis in the prosecutor's closing about how they needed – they needed to find who read the e-mail, that when this issue was brought up for the motion for new trial, the district court said, you know, until I read your papers, defense counsel, it never even occurred to me that the prosecution had offered an alternative theory. It's not dispositive, but I think it's significant. I'd like to move on to – Before you leave the variance argument, are you also advocating that we review the variance issue under the plain error standard of review? Yes. Yes. Neither claim was brought up for the motion for new trial. Well, you never raised that in your brief. I'm sorry? You didn't argue that in your brief. I did not. But it's – Well, you can't raise a new argument now, can you? Well, I think I can. I can think I can. And you're claiming they're raising the new argument they didn't raise before, and that's the truth of it. All the cases that we're relying on are cited in the case. I think at the time – But this is a new theory, plain error. Isn't it? No, it's not a new theory. It's just my first suggestion of it. Your first mention of it. That's right. But I think it is correct. This is the same circumstances in which – So we can go by what's correct, whether or not it's been raised before, right? Excuse me? We can go by what's correct, whether or not it's been raised before. Yes, I think that would be appropriate. On both sides. I'd like to move on to the argument that we are appealing, and that has to do with the departure. I missed the last one. It has to do with the what? I'm sorry. The sentencing departure. Oh. It's our claim that it was error. Now – We review that? We review that de novo? Is that right? Yes. Yes, and I've submitted the new case on that. That's U.S. v. Phillips has established that the standard of review is de novo. I think it would make a difference here, frankly. Well, I think – I mean, it doesn't matter since it is de novo, but I think, in fact, it wouldn't, and I'll tell you why. We made a number of arguments in our briefs, but I want to emphasize the one that I think really mandates reversal in this case, and which I really don't think the defense can get around, and that is this. The district court had no authority to depart based on the sentencing disparity, because under this court's decision in Banuelos, Rodriguez and Caperna, those cases state unequivocally that a departure based on sentencing disparity can only apply when the defendants being compared are convicted of the same offenses. They say similarity of conduct is not enough. Conduct arising from the same set of facts is not sufficient. And under Kuhn, and I quote, when a reviewing court concludes that a district court based a departure on both valid and invalid factors, a remand is required unless it determines the district court would have imposed the same sentence, absent reliance on the invalid factors. But we know in this case that the court relied on both factors and would not have departed on any one, because it said, with respect to disparity of sentences, again, I wouldn't depart on that alone, but, and then it continues, and the court had earlier said, I'm going to depart on the combination of aberrance and disparity. So because the court could not depart on the disparity of sentences, that's not a valid factor because the defendants to whom he was compared were not convicted of the same offenses. It was an invalid basis, and reversal is mandated. And I really don't think the defendant in its briefs or here can get around the holdings of Banuels, Rodriguez, or Caperna. I mean, they're just unequivocal that it must be the same offense of conviction. And I think because of this, the court needs to reverse the departure and remand for resentencing within the determined guideline range and that there shouldn't be opened up to any new bases for departure or any further considerations. I would also point out, though, that I think based on the aberrance aspect, that was also an invalid basis, which would also warrant reversal. The court need not reach that because I think the other is so clear. But I think that's true, too, because in that case, the district court itself said this doesn't reach aberrance. I find it's close to aberrant. And close to aberrant, under the guidelines, is not a valid basis for departure. And two invalid bases cannot be combined to form a permissible one. That's not what the complex of factors under Cook says. And Coon makes that clear. Where there's invalid factors, must remand. I'd like to address a little bit the loss issue that Defendant raises. I think the issue here, one, is that the district court need only come up with a reasonable estimate. Two, it really doesn't matter the methodology. I mean, the court used the most standard, which was to take the purchase date and the sales date, which were close in time. The reality is there were no intervening factors. But the defendant's argument is, well, it matters in this sense that the district court didn't realize, I think something like this, it had the discretion to consider some other methodology. Isn't that sort of the argument? What's your answer to that? That's her argument she's now making. But as this Court asked her, where's the evidence of that? There is none. There's no evidence in the record to suggest the district court didn't understand its discretion. She is saying that because the district court rejected her argument. But there's nothing in the sentencing transcript, I think, if you read that, to suggest that the court didn't understand its discretion. The fact is the expert testimony and the testimony in the case established that the vast majority, if not the whole increase in stock price, was due to the Xbox contract. And the government's expert, and he was not contested on this issue, did specifically look to see whether the overall market conditions and or the NVIDIA's being added to the stock index contributed to the stock price increase on those particular – during that particular timeline and said, I looked at that and the answer is no. To the extent the adding of the index may have had an effect, it would have been minimal. So there was nothing for the court to subtract out here. Even if you would have to subtract out known factors that were unrelated to the criminal conduct, there were no known unrelated factors in this case. The testimony was that the increase in stock was due to the Xbox contract. So, therefore, the loss calculation was completely proper and there's no reason to change the date that you take the price at from other than the – I'm sorry, other than the purchase date when the defendant used his inside information to gain a market advantage. Counsel, would you please briefly discuss the issue of the sufficiency of the evidence in the TIFI charge? On the TIFI charge? Sure. I'd be happy to. Specifically, the evidence that was presented showing that the defendant contacted the TIFI prior to the purchase. Right. The TIFI of the stock. That was pretty slight. Well, it was – it was circumstantial. That is to say there was no direct evidence. We didn't have phone records or e-mails communicating it, but you wouldn't see phone records because they lived in the same area code and worked in the same area code. The only evidence in the record was an e-mail one day after the purchase. Right. Well, what we have is that they were friends that were in close contact regularly. They had just been to a party together a couple days before. What we had is that the TIFI made his trade 15 minutes after the defendant made his trade, that neither had ever bought this stock before. Despite the patterns that the defendant's counsel talked about, the fact is this purchase was five times the average purchase that the defendant had ever made before and three times the average purchase that the TIFI had ever made before. And you have the fact that although we don't have evidence of any communication prior other than you could infer that from the very close timing of the purchase of the stock, you do have that the very next day the defendant sent, forwarded an e-mail to his friend about the Xbox contract. And I think a fair inference from that is that he had told him about the information, told him to buy the stock, his friend did buy the stock, and so the next day he's sending him information about it thinking, won't he be interested in that because he probably just bought the stock like I did. And I think that's where the Aldana testimony also comes in, because that gives further circumstantial evidence. The defendant denied that he told anybody before March 10th. But we have a witness who didn't have an interest in the case, you know, who wasn't charged as a TIFI, who, in fact, didn't trade on the information, saying, well, he told me before it was public information. He told me before the open trading window. And he even told me that it was inside information, basically, that he wasn't supposed to tell me. So to me, that put up red flags and I didn't buy it. So it goes to the defendant's credibility, again, as to whether he was telling people that they should go out and buy it. I mean, if he told his real estate agent, hey, I've got to, you know, you should go out and buy this, this is going to do well, that lends more credence to the claim that he would tell one of his close friends. What about opposing counsel's counterargument that this information was all over the Internet at that point? Well, she's confusing speculation and rumor, although strong, that analysts are reporting based on it looks like the loser to the contract, Gigapixel, had told some reporters or analysts. And so there was news speculating about the contract, okay, versus confirmation of those rumors by the players and the public announcement that, yes, in fact, this had occurred, and confusing that with what the employee's obligation is. I mean, the trading window was closed until March 14th or March 13th. I can't remember. A couple days after March 10th, the public announcement. So no one was free to disclose this information. And it wasn't yet public. Yes, news of it was leaking out, but that is different, and both experts testified about that, than confirmation of that information. Okay. You've just about used your time, and there don't appear to be any further questions. Thank you. Thank you, Justice. Your Honor, returning to the constructive amendment point, I do think it's significant that the government now raises the plain error point, although I don't have it with me. I am aware of case law that says if you raise an objection that generally encapsulates the grounds you want to raise on appeal, that's sufficiently preserved. This Court has never been extremely picky in insisting that objections be drawn directly on point. And, again, given the circumstances, there was an immediate objection by the trial counsel in closing argument as the argument came out, and, crucially, we raised this very issue below in the new trial motion. So I don't think this is a well-taken point. Was there a motion in limine regarding this issue, too? At the jury settlement instruction conference, there was a request by the defense to limit the theory of possession to the reading of the e-mail, and the Court denied that. So it did come up in that context as well before closing. You're right, Your Honor. With respect to the government's argument that this case is different from every other case this Court has had because there was proof in other cases supplemented by government arguments, supplemented in some cases by court instruction, I think that argument cuts against them because this was something sprung on Mr. Begutt at the 11th hour, in fact, the 12th hour, with no ability on his part to counteract it or to open up evidence or to bring in other witnesses. What is the – I had a little discussion with your opposition about whether this – what the office was abuzz about, because do you disagree that the date, the timing is critical here? I don't disagree that the timing is critical. But as I understand it, the government was saying the office is abuzz with news that NVIDIA has won the Xbox contract. Yes. And that is insight. And so that would be consistent with the government's theory that he then went to the e-mail to get the information that showed him what the timing would be. It would be if that was the way it was argued. But that's not the way it was argued. It wasn't that, oh, this was – the office was abuzz, and therefore he read the e-mail. In the cited portion, I think page 137, the government argues not a question of whether he read the e-mail, but the office was abuzz, he walked into the office, he walked to lunch, he passed all these cubicles. It's not that this then caused him to read the e-mail. It's that he heard about it through this information. And, again, I think the question of fairness is important, because had Mr. Begotten known that this was a theory that would be introduced, he could have brought in evidence to counteract whether the office was abuzz or not. But that's not something he was allowed to do. With respect to sentencing, I think the government and I have talked past each other on this issue. There is no case in this circuit that says that a court cannot use a combination of factors where one or the other of those factors is not fully allowable. In other words – The case that says the opposite, that if neither one quite makes it, you can combine the two? Indeed. And what's that case? Cook, United States v. Cook, which says that if you use a combination of factors, any one of which may not be sufficient in and of itself, then you can in combination use them to support a downward departure. I think that's the – What were the factors in Cook that we were looking at? I don't think it was generally discussed, Your Honor. As I recall, Cook was simply a – it was a short opinion. I don't quite recollect the facts at this point. But I think it was basically an answer to the district court's opinion that it couldn't use certain factors because one of them was not in itself sufficient to allow a downward departure. I think Coon stands for the same proposition, namely that you can take factors that in and of themselves are not sufficient, combine them, and then allow a downward departure. So I don't think there is anything to support the government's view. I am not arguing, and the district court did not find, that sentencing disparity in and of itself was sufficient to allow a downward departure here. And if I were arguing that, then Banuelos-Rodriguez would forbid that argument. That's not the argument here. Finally, with respect to the point that speculation and rumor and trading window obligations, the trading window obligations affected Mr. Begutt. They did not affect anybody else. He and anybody is free to discuss what's public information so long as he doesn't trade on it. So with that, Your Honor, I'll rest. Thank you. Thank you, counsel. The case just argued is submitted. The Court appreciates the quality of the arguments presented in the last case. That concludes the Court's calendar for this afternoon. The Court stands adjourned. Goodbye. The Court is adjourned. The Court is adjourned. Thank you. Thank you.
judges: Schroeder, Tashima Rawlinson